J-A24043-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| LAURA RONGIONE AND RANDY RONGIONE | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ABINGTON MEMORIAL HOSPITAL | : | |
| | : | No. 2902 EDA 2023 |
| Appellant | : | |

Appeal from the Judgment Entered October 17, 2023
In the Court of Common Pleas of Montgomery County Civil Division at
No(s): 2014-27658

BEFORE:    KING, J., LANE, J., and COLINS, J.[*]

MEMORANDUM BY LANE, J.:                **FILED DECEMBER 6, 2024**

Abington Memorial Hospital ("Hospital") appeals from the judgment entered in favor of Laura Rongione ("Wife") and Randy Rongione ("Husband") (collectively, the "Plaintiffs") in the amount of $8,000,000. We affirm.

On October 19, 2014, the Plaintiffs filed the underlying medical malpractice action against Hospital, "under a theory of *respondeat* superior[,] to hold it vicariously liable for the alleged negligence of its physician employees," Kanli Jiang, M.D. ("Dr. Jiang"), Victoria Myers, M.D. ("Dr. Myers"), Amanda Rhodes-Michael, M.D. ("Dr. Rhodes-Michael"), and Maria

---

[*] Retired Senior Judge assigned to the Superior Court.

Evidente, M.D. ("Dr. Evidente").[1] Trial Court Opinion, 12/4/23, at 2. Dr. Jiang and Dr. Evidente were also members of Abington Primary Women's Healthcare Group, which was "owned by" Hospital. N.T., 6/6/23 a.m., at 111-12; **see also** N.T., 6/13/23 a.m., at 4.[2] Saliently, the Plaintiffs averred that during Wife's Caesarean section surgery ("C-section"), the Hospital's employees failed to properly inspect and repair her left uterine artery, which was cut or transected, and this failure "allowed that artery to bleed into [Wife's] abdomen, causing . . . hypovolemic shock."[3] Trial Court Opinion, 12/4/23, at 5. The Plaintiffs further claimed the Hospital's employees failed to timely "move [Wife] to the operating room while her[] status was deteriorating[, which] caused her to go into cardiac arrest and required the emergency removal of her uterus." **Id**.

This matter proceeded to a jury trial in June 2023. We review the relevant evidence in detail. On October 10, 2013, Wife was admitted to

_____

[1] The Plaintiffs' complaint also raised claims of increased risk of harm and corporate negligence. However, they withdrew these at trial. **See** N.T., 6/9/23 p.m., at 59; **see also** N.T., 6/14/23 p.m., at 11-12.

[2] Separate morning and afternoon volumes of testimony were produced for each of the seven days of trial testimony. For ease of review, we include the appropriate "a.m." or "p.m." designation in our citations.

[3] Hypovolemic shock is an emergency condition involving "severe blood loss, which makes the heart unable to pump enough blood through the body." N.T. 6/6/23 a.m., at 57 (Plaintiffs' counsel's opening argument).

Hospital to deliver her second child.[4]  Labor progressed quickly, the baby's heart rate was low, and Wife did not have an epidural.  *See* N.T., 6/8/23 Wife, at 14; *see also* N.T., 6/12/23 a.m., at 57.  Dr. Jiang testified to the following: at 4:28 a.m., she and a nurse directed Wife to begin "pushing" for a vaginal birth.  N.T., 6/12/23 a.m., at 58.  Wife, who was "screaming," refused to cooperate, and "moved up [the bed] away from" her.  *Id*. at 59-60.  Because the baby's heart rate was "very low," Dr. Jiang "offered a vacuum assistance [*sic*] to . . . expedite the delivery."  *Id*. at 59.  However, with "no pushing from [Wife,] the vacuum popped off."  *Id*. at 60.

Dr. Myers testified that she entered the hospital room and observed Wife and Husband "screaming."  N.T., 6/12/23 p.m., at 60.  Dr. Myers described: "Her husband was yelling at her; she was yelling at her husband.  It was absolutely insane.  . . . I've never seen a scene like that before."  *Id*. at 61, 62.  Dr. Myers corroborated Dr. Jiang's summary of the events, including Wife's attempt to "push[] herself up to the top of the bed."  *Id*. at 60-61, 74.  Dr. Jiang and Dr. Myers advised Wife that she should push, as a C-section at

_____

[4] Wife delivered her first child vaginally.  *See* N.T., 6/8/23 Day Three, Afternoon Session, Testimony of Laura Rongione ("N.T., 6/8/23 Wife"), at 6.

There are two volumes of testimony dated June 8, 2023, both identified on their cover sheets as "Trial by Jury — Day Three, Afternoon Session."  The first volume also states in its heading, "Testimony of Peter Badgia [*sic*], Ph.D."  The second volume — which we cite above — includes the heading, "Testimony of Laura Rongione."  For ease of review, in citing this latter volume, we will use the shorthand reference, "N.T., 6/8/23 Wife."

that point would be dangerous. *Id*. at 62. Meanwhile, we note that Wife testified she "lost control of" her legs and denied "refusing to push when being told to push by [her] doctors" or moving away from Dr. Jiang and the nurse. N.T., 6/8/23 Wife, at 15-16.

Dr. Jiang then performed an emergency C-section, with the assistance of Dr. Myers and Dr. Rhodes-Michael. They delivered the baby at 4:49 a.m. After the delivery, Dr. Jiang observed, and her notes reported, a "bilateral uterine extension," meaning both the left and right sides of the incision in Wife's uterus had extended past the initial incision. N.T., 6/12/23 a.m., at 89-90. These extensions were "caused by the difficult maneuvers trying to get the baby out." *Id*. at 81. Dr. Jiang observed the right extension was more severe and "got into the right uterine artery," and the right artery was "active[ly] bleeding" "a lot." *Id*. Dr. Jiang repaired the right artery. The C-section concluded at 6:28 a.m. *See id*. at 96.

In the recovery room, Wife became hypotensive — she had low blood pressure — and tachycardic — she had a high heart rate. *See* Trial Court Opinion, 12/4/23, at 4. The trial court summarized:

> A bedside check of [Wife's] blood count showed that her hemoglobin was . . . dangerously low[. She] was not immediately moved to the operating room to find and repair the source of the bleeding. Instead, [Wife] was treated with phenylephrine, blood transfusions, and [intravenous ("IV")] fluids. [N.T., 6/7/23 p.m., at 40-41.]
>
> Dr. Jiang's shift was coming to an end and in preparation for continuity of care[,] Dr. Jiang[] met with [Dr. Evidente] to apprise her of [Wife's] status[.]

> [Dr.] Evidente took over [Wife's] care . . . and . . . continued to observe [Wife] as she deteriorated further over the next [forty to fifty] minutes. [Wife's] blood pressures dropped [even more] despite medication and blood transfusions.

*Id*. (paragraph break added).

Around 9:36 a.m. — approximately three hours after Wife's C-section concluded — Dr. Evidente prepared Wife for a second surgery.[5] *See* N.T., 6/12/23 p.m., at 124. Wife "arrived in the operating room . . . in cardiac arrest from hypovolemic shock, and required resuscitation efforts, including CPR. Dr. Evidente performed an emergency laparotomy" and discovered three liters of blood in Wife's abdomen. Trial Court Opinion, 12/4/23, at 4 (*citing* N.T., 6/13/23 a.m., at 51). Wife "went into cardiac arrest . . . a second time during the procedure, and required a second round of chest compressions and resuscitation measures[.] Dr. Evidente decided to perform an emergency hysterectomy." *Id*. at 5 (*citing* N.T., 6/12/23 p.m., at 128-29, 139-41).

We now review the evidence concerning Wife's left uterine artery in detail. We reiterate that Dr. Jiang's report indicated both sides of Wife's incision were extended. The Plaintiffs initially called Dr. Jiang to testify as if on cross-examination. Dr. Jiang recalled specifically inspecting Wife's uterus and incision for any bleeding. *See* N.T. 6/6/23 a.m., at 120. Dr. Jiang both visualized and palpated the left artery — or ran her finger along the course of

---

[5] Two other physicians, aside from those referred to above, assisted Dr. Evidente in this surgery. *See* N.T., 6/13/23 a.m., at 81.

the artery to ensure it was intact. *Id*. at 124-25. However, the Plaintiffs confronted Dr. Jiang with her deposition testimony, given in 2015, that she could not recall Wife's surgery specifically. The following exchange occurred:

> [Plaintiff's' Counsel reading aloud the deposition:] "QUESTION: Did you actually palpate and run your fingers along the course of the left uterine artery to see it was intact?
>
> "ANSWER: I routinely palpate for the uterine artery when it is not involved in the extension.
>
> "QUESTION: That answer my question [*sic*]. Did you do it in this case?
>
> "ANSWER: I always do it for all my C-sections.
>
> "QUESTION: Do you remember doing it in this case?
>
> "ANSWER: *I don't specifically remember doing it for this case, but I do it — I do it for every [C]-section*. That's what I do."
>
> Did I read that correctly?
>
> [Dr. Jiang:] Yes. And that is the same answer I just gave.
>
> Q. So you don't specifically remember doing it for this case, as it says here on page 50 [of the deposition]?
>
> A. I do it for every single case; therefore, I did it for this case.

*Id*. at 126 (emphasis added).

Dr. Rhodes-Michael, who assisted in the C-section, testified that she was able to see Wife's left uterine artery but saw no evidence of it bleeding. *See* N.T., 6/14/23 a.m., at 17, 40. However, on cross-examination, Dr. Rhodes-Michael acknowledged that in her deposition, she stated: (1) she did not remember seeing the left uterine artery — "[b]ecause it was covered by [the]

peritoneum"; and (2) "there **was** bleeding coming from the left side of the incision." ***Id***. at 36-37 (Hospital's counsel summarizing the deposition) (emphasis added).

Dr. Myers, who also assisted Dr. Jiang in the C-section, testified that during the C-section, there was no evidence that Wife's left uterine artery was bleeding. ***See*** N.T., 6/12/23 p.m., at 66.

Dr. Evidente, who performed Wife's second surgery and the emergency hysterectomy, prepared a post-operative report, which stated: "The left uterine artery was noted to be ***transected completely*** and was profusely bleeding." N.T., 6/13/23 a.m., at 56 (emphasis added). When confronted with her report at trial, however, Dr. Evidente characterized the left uterine artery as merely "open and . . . profusely bleeding." ***Id***. at 56-57.

Relevant to Hospital's issues on appeal, we summarize that Robert Michaelson, M.D. ("Dr. Michaelson"), who was also a partner of Abington Primary Women's Healthcare Group, was in the operating room during Wife's second surgery. ***See*** N.T., 6/14/23 a.m., at 5, 7; ***see also*** N.T., 6/6/23 a.m., at 112. However, he did not "scrub in," participate in the surgery, nor "have a view of the operative field." N.T., 6/14/23 a.m, at 7-8. At trial, Husband testified, over Hospital's hearsay objection, that immediately after Wife's second surgery, Dr. Michaelson told him and family members, "We messed up." N.T., 6/9/23 a.m., at 70-71. Husband's uncle, Marc Steinberg ("Uncle"), also testified that Dr. Michaelson told them, "We screwed up," and "talked

about them [*sic*] severing an artery on the left side of [Wife's] body, [Wife] effectively dying, and then they revived her." N.T., 6/9/23 p.m., at 42. Dr. Michaelson, however, denied making these statements and testified: "I can't believe that that's something I would ever say." N.T., 6/14/23 a.m., at 9.

Next, we review the testimony of both parties' expert witnesses. The Plaintiffs presented John Elliott, M.D. ("Dr. Elliott"), as an expert in obstetrics, gynecology, and maternal-fetal medicine. He opined as follows. The applicable standard of care requires a surgeon "to address any complications, including extensions bilaterally, left and right, of the uterine incision." N.T., 6/7/23 p.m., at 124. When presented with a uterine extension, the standard of care requires a "surgeon to visually inspect the area to see if there's any bleeding . . . and to palpate the blood vessels in the area to make sure that they are intact." N.T., 6/7/23 a.m., at 103. If there is damage to either uterine artery, the standard of care requires the surgeon "to ligate the bleeding vessels," or tie a suture "around the artery" in order to stop the bleeding. *Id*. at 104-05. Post-surgery, the standard of care requires a surgeon to "continu[e] to monitor the patient for any signs of further bleeding that would include shock." N.T., 6/7/23 p.m., at 124. If a patient exhibits signs of shock, the standard of care requires a physician to take the patient in a timely manner "back to the operating room . . . to try to find out where she [is] bleeding from." N.T., 6/7/23 a.m., at 88.

Based on his review of Dr. Evidente's report and other "materials in this case," Dr. Elliott opined that the cause of bleeding from Wife's left uterine artery was "[t]hat it was transected during the initial [C-]section." N.T., 6/7/23 p.m., at 45; *see also* N.T., 6/7/23 a.m., at 110 (Dr. Elliott opining, "There's no other plausible way that [the left] artery would be transected other than during the" C-section). Dr. Elliott thus opined that Dr. Jiang's, Dr. Myers's, and Dr. Rhodes-Michaels' treatment fell below the standard of care because they "missed the fact" and did "not adequately address the fact that the left uterine artery was transected." N.T., 6/7/23 a.m., at 87-88, 110.

With respect to Wife's post-C-section care, Dr. Elliott testified to the following: while Wife was exhibiting signs of shock, Dr. Jiang's and Dr. Evidente's failure to move her to the operating room sooner, "to try to find out where she was bleeding from," was below the standard of care. *Id*. at 88. A pregnant woman typically has a total blood volume of approximately five liters of blood, and the cause of Wife's two cardiac arrests "was excessive blood loss that led to hypovolemic shock." N.T., 6/7/23 p.m, at 49. Had the physicians taken Wife back to the operating room "in a timely manner," they would have discovered and repaired the left uterine artery "much earlier." *Id*. at 122. Dr. Elliott did not "have any criticism of Dr. Jiang's decision to perform the [C-]section [under] these circumstances." N.T., 6/7/23 a.m., at 97. However, he opined that as a result of the breaches of the standards of care, Wife "suffered excessive blood loss," "the loss of her uterus, . . . the inability

to have any more children," prolonged hospitalization, pain, suffering, and psychological trauma.[6]  *Id*. at 88-89.

Hospital called Owen Montgomery, M.D. ("Dr. Montgomery"), as an expert in obstetrics and gynecology.  He testified in support of the defense theory that sometime ***after*** the C-section, Wife "suffered a spontaneous rupture of her left uterine artery to explain the presence of blood [in her] abdomen."  Trial Court Opinion, 12/4/23, at 10 (*citing* N.T., 6/13/23 p.m., at 74).[7]  Dr. Montgomery based this opinion

> in large part, . . . on his explanation about the three liters of blood found in [Wife's] abdomen . . . two hours after the closure of the C-section uterine incision.  That explanation was premised on the ***rate of blood flow*** in the uterine arteries: if the left uterine artery had been lacerated during the C-section surgery[,] much more than [three] liters of blood would have been found in [Wife's] abdomen.

*Id*. at 11 (emphasis added).

At trial, Hospital sought to elicit testimony from Dr. Montgomery that the rate of blood flow in a transected uterine artery is "350 CCs per minute."  ***See*** N.T., 6/13/23 p.m., at 41.  Hospital first asked "specifically whether he

---

[6] The Plaintiffs also presented Peter Badgio, Ph.D., as an expert in the field of psychology.

[7] The cover sheet for the June **13**, 2023, afternoon session misidentifies the date as June **8**, 2023.  For identification purposes, this cover sheet also includes heading, "JURY TRIAL — DAY VI," and the transcript sets forth the testimony of Dr. Montgomery.  The trial court has cited this transcript with the date, "June 13, 2023," and for consistency, we cite this transcript as "N.T., 6/13/23 p.m."

had an opinion **based on his education, training and experience**[,] there is a known rate of blood flow in the uterine arteries." Trial Court Opinion, 12/4/23, at 11 (*citing* N.T., 6/13/23 p.m., at 32) (emphasis added). In response, Dr. Montgomery referred to "standard textbooks" that, although "not authoritative, [were] very useful." N.T., 6/13/23 p.m., at 32. The Plaintiffs objected, and the trial court sustained the objection, reasoning that Dr. Montgomery's opinion was based on a source he acknowledged was not authoritative. ***See id***. at 33-35. The parties then extensively argued additional points over the admissibility of Dr. Montgomery's anticipated testimony, but ultimately, the trial court sustained the Plaintiffs' objections on the grounds of, *inter alia*, the lack of a foundation. ***See*** Trial Court Opinion, 12/4/23, at 11 (*citing* N.T., 6/13/23 p.m., at 31-60).

> Nevertheless, as the trial court noted:
>
> Dr. Montgomery ultimately articulated the defense theory clearly[:] that it is inconceivable for there to have been a severed uterine artery at the time of the C-section[,] hours before three liters of blood were found in [Wife's] abdomen . . . . The only reasonable explanation is that the bleeding started **after** [Wife] left the labor and delivery operating room . . . .

***Id***. at 11-12 (*citing* N.T., 6/13/23 p.m., at 77). Dr. Montgomery opined, to a reasonable degree of medical certainty, that Dr. Evidente acted within the standard of care. N.T., 6/13/23 p.m., at 81.

Furthermore, Hospital asked Dr. Evidente herself — who performed the second surgery — her opinion as to when Wife's left uterine artery would have begun bleeding. ***See*** N.T., 6/12/23 p.m., at 135. Dr. Evidente responded

that blood flowed at approximately "300 [CCs] a minute," and it would take "about ten minutes" for "three liters or 3,000" CCs of blood to accumulate. *Id*. at 135-36.

Finally, we summarize that Hospital asked Dr. Montgomery for his opinion on whether a C-section "would have been necessary" if Wife "had pushed at the encouragement of her physicians." N.T., 6/13/23 p.m., at 86-87. Dr. Montgomery responded:

> ***I don't know for sure.*** I think what the chart reflects is that with pushing and the first vacuum, the station [—] which is how far the baby's head [is] through the narrowest part of the pelvis [—] was already at plus 2, which is 2 centimeters beyond the narrowest part.
>
> So even though a woman has had a previous successful vaginal delivery of a baby about the same size, with the baby at plus 2 station, the fastest way, the most likely way to get the baby out quickly would be vaginally, . . . but a vacuum alone doesn't work, or doesn't work very often. You need vacuum extraction, plus maternal effort. So if you only have the vacuum, you can't really pull the baby out without help. ***So I don't know that things would have changed, but if you didn't have to have a [C]-section you wouldn't have laceration, you wouldn't have hemorrhage, so you can interpret that***.

*Id*. at 87 (emphases added).

On the other hand, on this issue, Dr. Elliott responded that Wife's efforts to push

> had nothing to do with the injury or the failure — or the areas below standard. Whether [Wife] pushed or didn't push has nothing to do with adequately inspecting and detecting a lacerated left uterine artery. It has nothing to do with identifying significant hypovolemic shock and taking her to the operating room and repairing that artery that they would have found much earlier if

they had taken her in a timely manner.

N.T., 6/7/23 p.m., at 122.

Following the Plaintiffs' case in chief, Hospital orally moved for a nonsuit, and following the close of all evidence, orally moved for a directed verdict. ***See*** N.T., 6/9/23 p.m., at 49; ***see also*** N.T., 6/14/23 a.m., at 61. The trial court denied both motions.

Hospital requested a jury instruction on Wife's comparative negligence — based on her alleged "failure to follow her physicians' instructions to push to deliver her baby vaginally." Trial Court Opinion, 12/4/23, at 12. The trial court denied this request.

In rendering its verdict, the jury found: (1) Dr. Jiang's conduct fell below the applicable standard of care;[8] and (2) her negligence was the factual cause of harm to the Plaintiffs. The jury awarded $5,500,000 to Wife for pain and suffering, and $2,500,000 to Husband for loss of consortium.

Hospital filed a timely post-trial motion, requesting judgment notwithstanding the verdict ("JNOV")[9] and in the alternative, a new trial based

---

[8] The jury found Dr. Myers, Dr Rhodes-Michaels, and Dr Evidente were not negligent.

[9] Hospital preserved this JNOV issue, as it had moved for both a directed verdict and nonsuit at trial. ***See Mazzie v. Lehigh Valley Hosp.-Muhlenberg***, 257 A.3d 80, 87 (Pa. Super. 2021) (providing that "[t]o preserve the right to request a JNOV post-trial, a litigant must first request a binding charge to the jury or move for a directed verdict or a compulsory non-suit at trial").

- 13 -

on: the sufficiency and weight of the evidence; the trial court's refusal to charge the jury on comparative negligence; the admission of Husband's and Uncle's hearsay testimony about Dr. Michaelson statements to them; and the preclusion of Dr. Montgomery's testimony about the rate of blood flow in a transected uterine artery. The trial court denied the motion, and on October 17, 2023, entered judgment in favor of the Plaintiffs and against Hospital. Hospital timely appealed. Hospital and the trial court have complied with Pa.R.A.P. 1925.

Hospital presents the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by denying [Hospital's] motion for JNOV where [the] Plaintiffs failed to adduce sufficient expert testimony to establish: (1) an objective standard of care applicable to the one physician the jury found negligent; (ii) a breach of a standard of care by that physician; and (iii) a causal connection between a breach of an objective standard of care by that physician and [the] Plaintiffs' alleged harm?

2. Whether the trial court erred and/or abused its discretion by refusing to submit [W]ife's comparative negligence to the jury where: (i) Pennsylvania law requires that a comparative negligence claim must be submitted to the jury if there is any evidence to support it; and (ii) the record established that [W]ife's repeated refusals to follow her physicians' instructions during delivery caused a C-section that led to the harm about which [the] Plaintiffs complain?

3. Whether the trial court erred and/or abused its discretion by allowing two of [the] Plaintiffs' fact witnesses to testify to an inadmissible and extremely prejudicial "double-hearsay" statement (a purported concession that [Hospital] "messed up") in the absence of evidence that the declarant was employed by or was an agent of [Hospital] and that the statement was made within the declarant's alleged employment and/or agency, which was required to admit the

- 14 -

statement under Pa.R.E. 803(25) or any other hearsay exception?

4. Whether the trial court erred and/or abused its discretion in precluding a defense expert from testifying about a critical medical issue where the expert was qualified by training and experience to provide the proffered testimony, the subject matter was disclosed in and supported by medical literature in the expert's report, and the preclusion of this testimony caused [Hospital] severe prejudice by preventing the expert from directly refuting with scientific evidence [the] Plaintiffs' theory of liability?

Hospital's Brief at 5-6.

In its first issue, Hospital argues extensively that it is entitled to JNOV, as the Plaintiffs failed to present sufficient expert testimony to establish a standard of care and causation. We consider the applicable standard of review:

> [A] JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. [In doing so], we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference.
>
> Concerning any questions of law, our scope of review is plenary.
>
> [With regard to] questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the jury could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

- 15 -

***Mazzie***, 257 A.3d at 87 (citation omitted and paragraph breaks added).

This Court has stated:

To establish a *prima facie* cause of action for medical negligence, a plaintiff must demonstrate:

> (1) a duty owed by the physician to the patient; (2) a breach of that duty; (3) that the breach of duty was the proximate cause of the harm suffered by the patient; and (4) that the damages suffered were a direct result of that harm.

Determining whether there was a breach of duty involves a two-step process: first, a determination of the standard of care, and second, a determination of whether the defendant physician met that standard. To show causation, "the plaintiff must show that the [defendant physician's] failure to exercise the proper standard of care caused the plaintiff's injury."

A plaintiff in a medical negligence case must present an expert witness "who will testify, to a reasonable degree of medical certainty, regarding the standard of care (duty); that the . . . physician deviated from the standard of care (breach); and that such deviation was the proximate cause of the harm suffered." Further, "[the expert's] medical opinion need only demonstrate, with a reasonable degree of medical certainty, that [the defendant physician's] conduct increased the risk of the harm actually sustained, and the jury then must decide whether that conduct was a substantial factor in bringing about the harm."

> In determining whether the expert's opinion is rendered to the requisite degree of certainty, we examine the expert's testimony in its entirety. That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty. Accordingly, an expert's opinion will not be deemed deficient merely because he or she failed to expressly use the specific words, "reasonable degree of medical certainty." Nevertheless, an expert fails this standard of certainty if he testifies that the alleged cause possibly, or could have[,] led to the result, that it could

- 16 -

very properly account for the result, or even that it was very highly probable that it caused the result.

**Mazzie**, 257 A.3d at 87-88 (citations omitted).

In arguing for JNOV, Hospital first challenges the Plaintiffs' theory that Hospital's employees failed to visualize or palpate Wife's left uterine artery. Hospital presents the following arguments: first, Dr. Elliott did not, in fact, testify "to any degree of specificity about a standard of care accepted or recognized in the medical community that required Dr. Jiang to visualize or palpate [Wife's] left uterine artery." Hospital's Brief at 14 (emphasis omitted). Furthermore, even if the Plaintiffs had established such a standard of care, the opinion that Dr. Jiang did not visualize or palpate the left uterine artery is "directly at odds with the facts of record." *Id*. at 6. "Dr. Elliott admitted that he based [his] opinion solely" on: (1) the **lack** of a notation in Dr. Jiang's report that she visualized or palpated the left uterine artery, but a lack of documentation cannot be construed as "proof that something **did not occur**;" and (2) a drawing by Dr. Evidente, "a different doctor[,] depicting a transection of the left uterine artery one and a half hours after the C-section." *Id*. at 17 (emphasis in original). In any event, at trial, Dr. Jiang testified, "I do it for every single case; therefore, I did it for this case." *Id*. at 16 (emphasis omitted) (*quoting* N.T., 6/6/23 a.m., at 126). Hospital also challenges Dr. Elliott's response to the question, "[How do] you know that there was a failure to adequately inspect [the] left uterine artery?" — "There's no other plausible way [the] artery would be transacted other than during the"

- 17 -

C-section. Hospital's Brief at 18 (emphasis omitted) (*quoting* N.T., 6/7/23 a.m., at 110). Hospital avers this opinion was merely a "guess." *Id*. at 19 (emphasis omitted).

Second, Hospital avers the Plaintiffs failed to identify a standard of care with respect to Wife's post-C-section treatment and the timing of a second surgery. Hospital reasons: (1) Dr. Elliott had no criticism "with the manner in which the blood transfusion, . . . medical treatment[,] and [intravenous] fluids were administered before [Wife] was taken to the" second surgery; (2) the Plaintiffs "offered no evidence that *quantified in any way* the timing within which a second surgery was required;" and (3) Dr. Elliott's testimony was inconsistent, as he "acknowledged that it was appropriate for the physicians to assess [Wife] in the [recovery room] and not immediately 'rush' her back to surgery,'" but then stated "that care was not undertaken in a 'timely manner.'" Hospital's Brief at 21-23 (emphasis in original)

Third, Hospital claims the Plaintiffs failed to prove causation, and argues the following: none of the Plaintiffs' "experts testified that *had* Dr. Jiang visualized or palpated the left uterine artery . . . or brought [Wife] into the second surgery 'earlier,' [Wife] would not have required a hysterectomy and would not have sustained harm." *Id*. at 24 (emphasis added). Dr. Jiang, Dr. Myers, and Dr. Rhodes-Michael all testified, without dispute, "that there were no visible signs of bleeding during the [C-]section" or in the ensuing forty to fifty minutes. *Id*. at 26. There was no "empirical evidence to support the

conjecture that initiating surgery sooner would have . . . avoid[ed] a hysterectomy." *Id*. at 26-27. Although Dr. Elliott testified to the "need for a hysterectomy[,] he did not tie it to anything Dr. Jiang did or did not do." *Id*. at 27 (emphasis omitted).

In denying JNOV, the trial court found: (1) the jury's verdict was supported by sufficient evidence; and (2) "no two reasonable minds could agree that the outcome should have been rendered in favor of" Hospital. Trial Court Opinion, 12/4/23, at 17-18. The trial court found Dr. Elliott did appropriately testify as to a physician's standards of care: (1) to visually inspect a surgical area and palpate blood vessels to ensure they are intact; (2) to address any damage to uterine arteries, including bleeding, occurring during a C-section, and to ligate bleeding vessels; and (3) to provide proper post-operative care to a C-section patient. *Id*. at 8 (*citing* N.T. 6/7/23 a.m. at 88, 103-04). The trial court then cited Dr. Elliott's opinions that the following fell below the standard of care: Dr. Jiang's failure to inspect or palpate the left uterine extension and incision; and the physicians' post-operative treatment to and monitoring of Wife. *Id*. at 8-9 (*citing* N.T. 6/7/23 a.m. at 87-88). The trial court concluded the Plaintiffs presented "adequate evidence of the basis for Dr. Elliott's opinion regarding Dr. Jiang." *Id*. at 9.

We determine the record supports the jury's verdict and the trial court's denial of JNOV. *See Mazzie*, 257 A.3d at 87. Contrary to Hospital's assertions, we agree with the trial court that Dr. Elliott properly testified as to

the applicable standards of care regarding: the visualization, palpation, and ligation for any bleeding arteries during a C-section; and, when the patient exhibits signs of shock, the timely investigation for the source of any bleeding. **See** N.T., 6/7/23 a.m., at 88, 103-05; **see also** N.T., 6/7/23 p.m., at 124.

With respect to causation, Hospital's arguments go to the weight of the evidence — which were properly for the jury, as finder of fact, to resolve. Hospital acknowledges that in her deposition, Dr. Jiang stated that she could not recall "specifically" whether she palpated Wife's left uterine artery in this case, but Hospital emphasizes Dr. Jiang's trial testimony, that she palpates and visualizes the arteries in every single case, and therefore she had to have done it in this case. **See** Hospital's Brief at 15-16. Any inconsistency between these statements by Dr. Jiang, however, was for the jury to reconcile. **See** **Mazzie**, 257 A.3d at 87. Similarly, it was the jury's province to weigh Dr. Evidente's post-operation report, which described the left uterine artery as "transected completely," with any repudiation of that term in her trial testimony. **See** N.T., 6/13/23 a.m., at 56-57 (Dr. Evidente acknowledging that she used the term "transected completely" in her report, but stating, "[W]hat I found at the time of the surgery was an open . . . left uterine artery, that was open and . . . profusely bleeding"). Finally, the jury was to weigh all of this evidence against the opinions of both parties' expert witnesses: Dr. Elliott's reliance on Dr. Evidente's report and conclusion that the cause of bleeding was that the artery was "transected" during the C-section, and Dr.

Montgomery's opinion that Wife's artery instead spontaneously ruptured sometime after the C-section. This Court may not substitute our judgment, and we determine the trial evidence of record supports the jury's verdict. **See Mazzie**, 257 A.3d at 87. Accordingly, we determine no relief is due on the Plaintiffs' first issue.

In its second issue, Hospital claims the trial court erred in refusing to instruct the jury on Wife's comparative negligence. "In considering whether a trial court properly refused to submit an issue to the jury, we must view the record in the light most favorable to the party who sought to submit that issue to the jury." **Dailey v. Smith**, ___ A.3d ___, ___, 2024 WL 4456426 at *2 (Pa. Super. 2024). This Court has stated:

> For comparative negligence of a plaintiff to be submitted to the jury, there must be evidence from which the jury could find both that the plaintiff was negligent and that his negligence caused the injuries for which he seeks damages. Where there is sufficient evidence for a jury to find both of these elements, the issue of the plaintiff's negligence must be submitted to the jury, no matter how strong or persuasive the countervailing evidence is, and failure to do so is reversible error.

**Id**.

Hospital asserts that although its expert, Dr. Montgomery, "could not say (and was not required to say) 'for sure' what would have happened" if Wife had vaginally delivered her baby, he did "explain[] the causal link between [Wife's] refusals to push and the ultimate need for a hysterectomy." Hospital's Brief at 38. Hospital contends that Dr. Montgomery thus established "with the requisite degree of certainty that [Wife's] alleged [comparative]

negligence was a factual cause of harm."[10]  *Id*. 40.  Hospital also cites the following trial testimony in support: Dr. Jiang testified "that she specifically 'instructed' [Wife] to push because a mother 'needs to push,' pushing is more important than the vacuum because the baby cannot be delivered without pushing, and [Wife] nonetheless 'refused' to push."  *Id*. at 32-33.  Wife and Husband acknowledged, respectively, that the doctors told Wife "she was not pushing hard enough" and "that she was repeatedly instructed to push to avoid harm to the baby."  *Id*. at 35.  Dr. Myers testified that after being "involved in 'thousands' of deliveries[, she] had 'never' seen a patient refuse to push."  *Id*. at 33.  Hospital maintains that this "evidence clearly would have allowed the jury to conclude that [Wife] could have avoided a C-section and subsequent harm if she had simply pushed when urged to do so by multiple

_____

[10] Hospital also claims the Plaintiffs' counsel conceded this causal link in her opening argument, when she stated, "In other words, if [Wife] had only pushed harder she would not have needed a [C]-section and this wouldn't have happened."  Hospital's Brief at 32, 37, 42 (*quoting* N.T., 6/6/23 a.m, at 62).  We disagree.  A review of this statement in its proper context reveals that the Plaintiffs' counsel was merely referring to what **Hospital's** claim would be:

> I expect you might hear some finger point during this trial.  And what I mean by that is pointing a finger at [Wife].  A few of [Wife's] doctors testified during their deposition that when she first got to the hospital and she was in labor, she wasn't cooperative during pushing the effort, which is why the [C]-section needed to be called.  **In other words, if [Wife] had only pushed harder she would not have needed a [C]-section and this wouldn't have happened.**

N.T., 6/6/23 a.m, at 62 (emphasis added).

medical providers." *Id*. at 32. Hospital also disputes Wife's trial testimony "that she was unable to push because she lost control of her legs," where Dr. Myers testified she saw Wife "use her legs to push herself away from the physicians." *Id*. at 34. Hospital's expert, Dr. Montgomery, also testified that Wife had not received an epidural and thus "her inexplicable refusal to push was voluntary." *Id*. at 35.

In denying the request for the jury instruction, the trial court found: "[Hospital] did not offer opinion testimony with the requisite degree of certainty that [Wife's] alleged [comparative] negligence was a factual cause of any harm suffered by her." Trial Court Opinion, 12/4/23, at 19. The trial court reasoned:

> Dr. Montgomery was not as resolute[,] although he testified that all of his opinions were offered within a reasonable degree of medical certainty. ***He testified that "I don't know for sure[,]"*** when asked to opine on the impact of [Wife's] failure to push when encouraged by her physicians on the necessity of performing the C-section.

*Id*. at 12 (*citing* N.T., 6/13/23 p.m., at 87) (emphasis added).

Additionally, the trial court emphasized that any comparative negligence by Wife was not the cause of the alleged harm. Dr. Elliott "explicitly testified that he does not criticize Drs. Jiang, Myers, and/or Rhodes[-]Michaels . . . for the manner in which they treated [Wife] before the C-section surgery or Dr. Jiang's decision to perform a C-section to deliver the . . . child." *Id*. at 10 (*citing* N.T., 6/7/23 p.m., at 122-23). Instead, the Plaintiffs

complain[ed] that the failure of [Hospital's employees] to properly inspect and repair the "cut" or "transected" or "lacerated" left uterine artery before closing her C-section incision allowed that artery to bleed into [Wife's] abdomen, causing her to go into hypovolemic shock. Drs. Jiang and Evidente's failure to move [Wife] to the operating room while her[] status was deteriorating caused her to go into cardiac arrest and required the emergency removal of her uterus, rendering her incapable of having any children in the future. . . .

*Id*. at 5.

After reviewing the record in the light most favorable to Hospital, we determine the trial court did not err in refusing to submit this issue to the jury. *See Dailey*, ___ A.3d at ___, 2024 WL 4456426 at *2. We reiterate that an expert opinion fails to meet "the requisite degree of certainty" "if he testifies that the alleged cause possibly, or could have[,] led to the result, that it could very properly account for the result, or even that it was very highly probable that it caused the result." *Mazzie*, 257 A.3d at 88. Dr. Montgomery's testimony fell below these standards. As the trial court pointed out, when directly asked whether he believed a C-section "would have been necessary" if Wife had complied with the Hospital's employees' "encouragement" to deliver vaginally, Dr. Montgomery replied, "I don't know for sure." N.T., 6/13/23 p.m., at 87.

Furthermore, we consider Dr. Montgomery's testimony, "So I don't know that things would have changed, but if you didn't have to have a [C]-section you wouldn't have laceration [*sic*], you wouldn't have hemorrhage, so you can interpret that." *Id*. This opinion presumes that the mere fact of a C-section,

alone, brings about or leads to uterine bleeding. However, Dr. Montgomery's own opinion — that Wife's uterine artery spontaneously ruptured sometime *after* the C-section concluded — does not support this conclusion. *See id*. at 74. For all of the foregoing reasons, we do not disturb the trial court's conclusion that Dr. Montgomery did not render his opinion with the requisite degree of certainty. Accordingly, Hospital's second issue merits no relief.

In its third issue, Hospital asserts the trial court erred in admitting, under the "admission by a party opponent" exception to the hearsay rule, Husband's and Uncle's testimony that after Wife's second surgery, Dr. Michaelson told them, "We messed up." Hospital's Brief at 43-44. We review the applicable standard of review:

> It is well established in this Commonwealth that the decision to admit or to exclude evidence, including expert testimony, lies within the sound discretion of the trial court. Moreover, our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Harris v. Toys "R" Us-Penn, Inc.*, 880 A.2d 1270, 1274 (Pa. Super. 2005) (citation omitted).

Generally, hearsay is not admissible. *See* Pa.R.E. 802. Our Rules of Evidence define hearsay as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1)-(2).

- 25 -

Rule 803(25)(D) sets forth the "admissions by a party opponent" exception to the general rule against hearsay. *See* Pa.R.E. 803(25)(D). It allows a statement that "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" *Id*.

> For an admission of a party opponent to be admissible under Rule 803(25)(D), the proponent of the statement must establish three elements: (1) the declarant was an agent or employee of a party opponent; (2) the declarant made the statement while employed by the party opponent; and (3) the statement concerned a matter within the scope of agency or employment.

*Harris*, 880 A.2d at 1275.

Hospital argues that the Plaintiffs failed to establish that Dr. Michaelson was Hospital's employee or agent. Hospital avers that instead, the evidence indicated only that Dr. Michaelson was an employee of Abington Primary Women's Healthcare Group. Hospital also contends that the admission of the hearsay was prejudicial, as it related to the fundamental issue at trial — "whether negligence had occurred during [Hospital's] care of" Wife. Hospital's Brief at 48.

At trial, the parties extensively argued the issue of whether the Plaintiffs' established Dr. Michaelson was Hospital's employee, irrespective of being a partner of Abington Primary Women's Healthcare Group. *See* N.T., 6/9/23 a.m. at 8-14, 55-67. The trial court found that "Dr. Michaelson's status as an agent or employee of [Hospital] was clearly established," and thus permitted

- 26 -

the testimony by Husband and Uncle.  Trial Court Opinion, 12/4/23, at 18; *see also* at N.T., 6/9/23 a.m. at 65.

After review of the record, we determine the trial court did not abuse its discretion in admitting the hearsay testimony.  We first reiterate that Hospital's full name is Abington Memorial Hospital, and observe that throughout trial, both parties referred to it simply as "Abington."[11]  Dr. Jiang testified that Dr. Michaelson was a partner at Abington Primary Women's Healthcare Group, which was "owned by Abington," and was "*also* [an] employee[] at Abington at the time."  N.T., 6/6/23 a.m., at 111 (emphasis added).  Additionally, Dr. Michaelson testified he was "was on staff at Abington" from 1980 to 2017.  N.T., 6/14/23 a.m., at 5.

In light of the above testimony, we do not disturb the trial court's evidentiary ruling.  Dr. Jiang and Dr. Michaelson himself testified that he was employed by, and "was on staff at" Abington at the time of Wife's surgeries.  N.T., 6/14/23 a.m., at 5; *see also* N.T., 6/6/23 a.m., at 111.  We thus conclude the trial court did not abuse its discretion in admitting the hearsay statement, made by Dr. Michaelson while he was an employee of Hospital.  *See* Pa.R.E. 803(25)(D).  We conclude no relief is due on Hospital's third issue.

In its final issue, Hospital avers the trial court erred in precluding its expert, Dr. Montgomery, from testifying as to the blood flow rate in a uterine

_____

[11] Throughout its brief, Hospital similarly refers to itself as "Abington."

artery. We reiterate that the admission of the evidence, including expert testimony, lies within the trial court's sound discretion. ***See Harris***, 880 A.2d at 1274. Additionally, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." ***Id***.

As stated above, Hospital sought to elicit this opinion from Dr. Montgomery's expert report: "[Wife's] severed artery would have led to blood loss of 350 [CCs] per minute, in which case she would have [died] within approximately [eighteen] minutes, while the C-section was still ongoing and long before the second surgery . . . more than an hour and a half later." Hospital's Brief at 49 (emphasis omitted). Hospital maintains such testimony — whether characterized as a fact or an opinion — was admissible under Pa.R.E. 703.[12] Hospital reasons that the support of medical literature for this opinion was not required, but in any event, Dr. Montgomery's report did cite *Williams Obstretics*, which he described as "very useful," as well as *Gabbe* and "a number of published articles." ***Id***. at 55-56. Hospital further avers that

---

[12] Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

Dr. Montgomery's opinion was supported by his more than thirty years' experience and training. Hospital asserts that Plaintiff's objection — that the testimony would confuse the jury — was meritless, as "[t]he issue was not **how much** blood was found in [Wife's] abdomen[, but rather] **how quickly** it got there." **Id**. at 57 (emphasis in original). Hospital also points out that Dr. Evidente "was permitted to testify to the known rate of blood flow during her testimony," but argues that in their closing argument, the Plaintiffs "disingenuously suggested . . . that [Hospital] voluntarily decided not to have its expert address [this] issue." **Id**. at 58-59. Hospital concludes that the preclusion of the evidence was prejudicial, because if it were admitted at trial, it would have "debunked [the] Plaintiffs' theory that the bleeding began during the first surgery and . . . the injury was caused by Dr. Jiang's conduct." **Id**. at 49, 57.

The trial court found there was no error because "Dr. Montgomery ultimately testified about the facts regarding the rate of blood flow and the uterine arteries." Trial Court Opinion, 12/4/23, at 19. The trial court further considered that Dr. Evidente corroborated his opinion, and found Hospital failed to sufficiently articulate how the ruling affected the jury's verdict.

After review of the record, we find no abuse of discretion in the trial court's finding that Hospital failed to establish such prejudice as to warrant a new trial. **See Harris**, 880 A.2d at 1274. We thus affirm its evidentiary ruling on this basis. As the trial court pointed out, although Dr. Montgomery was

precluded from stating the rate of blood flow, he testified as to his opinion that, based on the amount of blood found in Wife's abdomen, her uterine artery could not have started bleeding during the C-section, but instead had to have started later:

> [Y]ou can't have a severed bleeding artery for two hours where nobody notices 2,000 [*sic*] [CCs] of blood, it's impossible. Which means that because it was in the second surgery transected and pumping [*sic*], at some point it had to have either ruptured or torn, and **it then started bleeding closer to the time of the second surgery but clearly not in the first hour in the [recovery room]**.
>
> * * * *
>
> . . . [Wife's] vital signs were stable enough to close [her incision], get an X-ray, transfer her to [the recovery room], so she wasn't unstable. If you bleed thousands of [CCs] in your abdomen, you're unstable, which ultimately [did] happen at 9:24 [a.m.] So somewhere the vessels ruptured and the pumping start[ed] and the bleeding started, **just wasn't in the operating room at [5:00] in the morning** [*sic*].

N.T. 6/13/23 p.m., at 75-77 (emphases added). Dr. Montgomery further stated: "[The bleeding] likely . . . happened between 8:30 and 9:24 [a.m.], but I have really no way of telling you when exactly it happened." **Id**. at 78.

Additionally, while Hospital makes a passing reference to Dr. Evidente's testimony, **see** Hospital's Brief at 58, we emphasize, as did the trial court, that Hospital elicited from her the same testimony that is at issue. Dr. Evidente testified as follows:

> [Plaintiff's counsel:] Tell us, please, the three liters of hemoperitoneum, knowing what you know about . . . uterine arterial bleeding at nine months[' pregnancy], **what was your opinion as to when that had started**?

[Dr. Evidente:] When the three liters of blood started?

Q. Yes.

A. So when I looked at the patient's abdomen and made an approximation that there's about three liters of blood, and then when . . . think about . . . a uterine artery, which is a major artery, there's a lot of blood flow through that artery. It's one of your major arteries in your body and there's a lot of blood that flows through that, *approximately about 300 [CCs] a minute.*

. . . And so if you're just doing simple math, . . . with three liters or 3,000 [CCs], *and if the blood flow is about 300 [CCs] a minute*, if you divide that, . . . *my belief is that [it takes] ten minutes for that to happen*. Just sort of by simple math of what I saw in the operating room when I opened [Wife's] abdomen and looking at . . . the amount of blood flow in a uterine artery, . . . *3,000 [CCs] at 300 [CCs] a minute is about ten minutes*.

N.T. 6/12/23 p.m., at 135-36 (emphases added).

In sum, Dr. Evidente testified as to her opinions that: (1) blood flowed from a uterine artery at a rate of 300 CCs per minute; and (2) given the approximately three liters of blood found in Wife's abdomen, the bleeding would have started ten minutes earlier. We agree with the trial court that the above two witnesses' testimony supported the defense theory that Wife's uterine artery could not have started bleeding during the C-section, but instead sometime after. Thus, we likewise conclude that Hospital has not shown the trial court's ruling caused such harm or prejudice necessitating a

new trial, and thus we do not find any abuse of court's discretion.[13] Accordingly, no relief is due on Hospital's final issue.

As we conclude that none of Hospital's issues merit relief, we affirm the judgment entered in favor of the Plaintiffs and against Hospital.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/06/2024

---

[13] As we deny relief on the basis of no prejudice, we do not reach, and offer no opinion on, Hospital's arguments as to the admissibility of the testimony.